

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

### NO. 02-11-00075-CV

IN THE INTEREST OF J.N.H., A
CHILD

----------

FROM THE 367TH DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellant E.B. appeals the termination of his parental rights to his daughter, J.N.H. He contends in four issues that the evidence is insufficient to support the jury's findings that termination is in J.N.H.'s best interest and that he knowingly placed or allowed J.N.H. to remain in conditions or surroundings that endangered her, engaged in conduct that endangered her physical and emotional well-being, and voluntarily abandoned J.N.H.'s mother while failing to provide adequate support or medical care to her. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

**Background Facts**

J.N.H. is not appellant's only child; appellant has two other children, both sons, whom he has not seen in several years. After his first son was born in April 2003, appellant burglarized a vehicle in August 2003, was arrested for possession of crack cocaine in October 2003, and was placed on a three-year probation term for that offense in January 2004. In the early months of 2004, the State charged appellant with two other offenses for which he was eventually convicted: assault-family violence against his sons' mother and unlawful carrying of a knife that the police found in a vehicle that appellant had stolen. Because appellant failed to report to his probation officer for his possession-of-crack-cocaine offense, the State filed a motion to revoke the probation in April 2004, and after a court revoked the probation, appellant served time in three facilities. About a month before appellant's December 2004 release from confinement, his first son's mother, now pregnant with appellant's second son, left appellant, and he has never again heard from her or his two sons.

In 2005, appellant began dealing drugs. Within just a few months after his release from confinement for his first possession-of-crack-cocaine offense, appellant committed, and was eventually convicted for, three deadly conduct offenses[2] and possession of marijuana. Not long after appellant committed those

---

[2]While appellant was in a car with people that he knew through selling drugs, he waived a gun at another car while chasing the car on a highway because someone in that car had "flipped [appellant] off."

2

offenses, in April 2005, the police arrested him again for possession of crack cocaine, and he was incarcerated for eleven months. When authorities released appellant from confinement in 2006, he was approximately twenty-one years old, and he met J.N.H.'s mother, E.H., who was approximately sixteen years old. But only two months after being released from confinement, in May 2006, appellant was yet again arrested for possession of crack cocaine. That offense resulted in him spending eight months in county jail before being convicted and receiving a sentence of time served; he was released from confinement on a condition that he live at a halfway house. Because appellant opted not to live at the halfway house, he was reconfined for two more months.

When appellant was released in approximately July 2007, he eventually started using drugs again. It was about that time that he became more closely acquainted with E.H. They began using heroin, mixed with Tylenol, "just about every day" and had sex a few times, although appellant was then dating another woman who became his wife in October 2008.

In early 2008, E.H. informed appellant that she was pregnant with his child. According to appellant, E.H. used drugs while pregnant with J.N.H., and appellant told suppliers to not give drugs to E.H. According to E.H., appellant gave her $20 and told her to "save it" for J.N.H., but he otherwise never supported E.H. or J.N.H. nor asked about E.H.'s or J.N.H.'s medical care.[3] A few

---

[3]Appellant testified that he does not recall giving money to E.H., but he said that she never asked for money.

3

months before J.N.H. was born, in the summer of 2008, the police arrested appellant for aggravated robbery with a deadly weapon, to which he pled guilty. Appellant had used a BB gun while taking a lady's purse. A court sentenced him to twenty years' confinement, which makes him eligible for parole in November 2018. According to appellant's mother, between October 2003 and the time of trial in February 2011, appellant spent only twenty-two months outside of confinement.

J.N.H. was born in August 2008 while appellant was in prison; E.H. wrote a letter to appellant to tell him about the birth. Appellant has never met J.N.H., although he sent her a card on her first birthday. Given his confinement, he was ruled out as a suspect in J.N.H.'s November 2009 injuries, for which the Department of Family and Protective Services (the Department) originally obtained custody of J.N.H. Specifically, J.N.H., who was eighteen months old at the time, had burn blisters on her feet, bruises on her body and face, swollen and bleeding eyes, and hair loss as a result of her hair being pulled out. The bruising appeared to have occurred over a period of time.[4] J.N.H. also tested positive for

---

[4]Lishawa Jackson, a Child Protective Services (CPS) investigator, described J.N.H.'s injuries as the "most severe . . . [she] had seen," although Jackson was unsure who, between E.H. and E.H.'s girlfriend, caused them. E.H. was convicted of child endangerment and was sentenced to a year in state jail, and E.H.'s girlfriend was convicted for causing bodily injury to a child and was sentenced to ten years' confinement.

4

heroin.[5]   The Department placed J.N.H. in foster care and sent a letter to appellant to explain that she had been removed from E.H.  Appellant responded to the letter by acknowledging his paternity of J.N.H. and by asking the Department to allow J.N.H. to live with his mother or grandmother.

The Department filed a petition for the termination of J.N.H.'s parents' rights.  The trial court entered orders that named the Department as J.N.H.'s temporary sole managing conservator.  In response to the Department's petition, E.H., who was twenty years old at the time of the trial, voluntarily relinquished her parental rights to J.N.H.  But appellant answered the petition, received appointed counsel, and contested the termination of his parental rights in a jury trial that included testimony from appellant, his mother and sister, E.H., E.H.'s cousin, a gang expert, a Court Appointed Special Advocates (CASA) representative, and two Department representatives.

The Department and CASA representatives recommended against placing J.N.H. in the home of appellant's mother because although she passed criminal history and background checks, she never completed the home study administered by the Department; she repeatedly failed to respond to the Department's efforts to gather necessary information regarding her ex-boyfriend of fourteen years.   Andrea Calloway, the CASA volunteer who worked on J.N.H.'s case, believed that it was suspicious that appellant's mother would not

---

[5]Contrary to appellant's testimony, E.H. testified that she stopped using heroin while pregnant with J.N.H. but began using it again after J.N.H.'s birth.

provide the information regarding her ex-boyfriend. Calloway said, "If there was nothing to hide, then she would have provided it." In addition, the Department's caseworker, Amanda Mention, expressed concern about the fact that appellant's mother had allowed appellant to live with her while she knew that he was using drugs.[6] The Department also ruled out placing J.N.H. with relatives on E.H.'s father's side of the family because they had "extensive criminal histor[ies] and CPS histor[ies]."

Instead, the Department and Calloway recommended that E.H.'s cousin, who lives in Houston, adopt J.N.H., and E.H. and her cousin shared that desire. The Department completed a home study on E.H.'s cousin, and Calloway thought that E.H.'s cousin's family was "extremely appropriate" and that they would be a "great placement" for J.N.H.

At the time of the jury trial, J.N.H. was approximately two and a half years old. E.H.'s cousin was a teaching assistant for high school special education students, and she was married to a man who held a stable job. They had two children of their own, but they still wanted to adopt J.N.H. J.N.H. got along with the family, who had traveled a long distance to visit her for several hours on most weekends from December 2010 until the trial in February 2011.

---

[6]Appellant's mother conceded that appellant "probably" used drugs in her home and that she never tried to stop him from doing so. When she was asked whether it was important to her whether appellant was using drugs in her home, appellant's mother said, "I don't know what to say there."

After hearing all of the testimony, the jury deliberated for only fifteen minutes before finding that the evidence supporting termination was clear and convincing. Specifically, the jury decided that termination was in J.N.H.'s best interest and was appropriate under subsections (D), (E), (H), and (Q) of family code section 161.001(1). Accordingly, the trial court rendered a judgment that terminates appellant's parental rights to J.N.H. Appellant brought this appeal.

## The Propriety of the Jury's Termination Decision

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code. Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

7

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001 (West Supp. 2011). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002).

**Statutory ground for termination**

In his first three issues, appellant challenges the sufficiency of the evidence to support the jury's findings for the statutory grounds for termination under subsections (D), (E), and (H) of family code section 161.001(1). *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (H). Under section 161.001, the petitioner must establish a ground listed under subsection (1) of the statute and prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Under the first element, only one predicate finding listed under subsection (1) is necessary to support a termination judgment. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re J.T.G.*, 121 S.W.3d 117, 128 (Tex. App.—Fort Worth 2003, no pet.). Accordingly, in evaluating the first element, we need only address predicates necessary to support termination. *See A.V.,* 113 S.W.3d at 362; *see also* Tex. R. App. P. 47.1 (requiring appellate court to address only issues necessary to disposition of appeal).

8

Appellant does not challenge the jury's answer to question four of the jury charge, in which the jury found by clear and convincing evidence that appellant knowingly engaged in criminal conduct that resulted in his conviction, confinement, and inability to care for J.N.H. for two years from the date of the filing of the petition. Moreover, appellant presumes that his conviction for aggravated robbery with a deadly weapon, which resulted in his imprisonment without eligibility for parole until 2018, seven years from the petition date, satisfies the jury's finding to terminate his parental rights under section 161.001(1)(Q). *See* Tex. Fam. Code Ann. § 161.001(1)(Q); *A.V.*, 113 S.W.3d at 360. Thus, we hold that the jury's finding under section 161.001(1)(Q) is dispositive of the first element required for termination, and we need not decide whether the jury's termination decision was also appropriate under subsections (D), (E), and (H). *See In re D.S.*, 333 S.W.3d 379, 388 (Tex. App.—Amarillo 2011, no pet.). We overrule appellant's first three issues. *See J.T.G.*, 121 S.W.3d at 128.

**J.N.H.'s best interest**

We must, however, consider appellant's fourth issue on appeal: whether the evidence is factually sufficient to establish that termination is in the best interest of the child. In reviewing the evidence for factual sufficiency, we must give due deference to the jury's findings and not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, the jury could reasonably form a firm conviction or

9

belief that termination of the parent-child relationship is in J.N.H's best interest. *See* Tex. Fam. Code Ann. § 161.001(2); *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child by these individuals or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re Z.C.*, 280 S.W.3d 470, 475–76 (Tex. App.—Fort Worth 2009, pet. denied). Undisputed evidence of just one factor may be sufficient in a particular

case to support a finding that termination is in the best interest of the child. *C.H.*, 89 S.W.3d at 27. On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

J.N.H. is a young child with a history of traumatic physical abuse. The jury could have reasonably determined, therefore, that her best interest includes shelter from additional harm and uncertainty. *See* Tex. Fam. Code Ann. § 263.307(a), (b)(1), (3); *In re T.T.F.,* 331 S.W.3d 461, 485 (Tex. App.—Fort Worth 2010, no pet.). While appellant did not contribute to J.N.H.'s injuries, he previously pled guilty to an assault-family violence charge, committed deadly conduct, and is currently serving a twenty-year sentence for aggravated robbery with a deadly weapon. The jury could have rationally concluded that it is in J.N.H.'s best interest for her future to be untangled from these kinds of offenses. *See* Tex. Fam. Code Ann. § 263.307(b)(12)(E); *In re R.R.,* 294 S.W.3d 213, 235 (Tex. App.—Fort Worth 2009, no pet.) (considering evidence of a father's past convictions supportive to the trial court's best interest finding).

Next, our evaluation of appellant's parenting abilities cannot discount his participation in drugs and criminal conduct while being a father. *See* Tex. Fam. Code Ann. § 263.307(b)(12). Appellant's use and dealing of drugs has been extensive, and appellant continued to use drugs after he fathered two sons. Despite several confinements for drug-related offenses, appellant consistently resumed taking drugs upon being released. Appellant suggests that his current imprisonment will break that cycle. Nevertheless, appellant's frequent return to

drugs is a factor that the jury was entitled to consider in evaluating J.N.H.'s best interest. *See R.R.*, 294 S.W.3d at 235 (giving weight to a father's history of alcohol abuse); *see also In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (op. on reh'g) (countering a parent's assertion that he had changed and that past indiscretions should not be held against him by noting that the parent's "track record . . . raise[d] doubts about his ability to change").

After his first son was born, appellant was arrested for possession of crack cocaine in 2003, and he received three years' probation in January 2004. Although it would have been better for his son for appellant to complete his three-year probation, appellant never attempted to begin the probation, and after the probation was revoked, appellant was sentenced to confinement in state jail for ten months. Thus, appellant was removed from having direct contact with his son during that time. Upon being released from confinement, appellant dealt drugs and was again arrested for possessing crack cocaine. Later, he was arrested for three deadly conducts and pled guilty to those offenses. Appellant continued his drug use and criminal activity while E.H. was pregnant, including committing the offense for which he is currently incarcerated. Appellant provides no excuse for his criminal and drug activity. The jury could have reasonably adjudged this evidence to be in favor of termination. *See In re J.M.*, No. 02-08-00259-CV, 2009 WL 112679, at *10 (Tex. App.—Fort Worth Jan. 15, 2009, no pet.) (mem. op.) (considering a parent's substance abuse history in evaluating

12

the sufficiency of the evidence to show termination was in the child's best interest).

E.H testified that appellant encouraged her to abort J.N.H. because appellant "didn't want to have a baby," but appellant denied it and claimed he told her to keep the child because he would "be there for her." Assuming that appellant's version of that story is the correct one, his inability to honor that commitment is significant: rather than being there for J.N.H., appellant has not even met her; he was incarcerated about two months before she was born for committing aggravated robbery with a deadly weapon while under the influence of crack cocaine and heroin. The fact that appellant has never met J.N.H. indicates that he likely does not possess an understanding of J.N.H.'s needs and capabilities. *See* Tex. Fam. Code Ann. § 263.307(b)(12)(F).

The jury could have also found that appellant's association with a gang weighed in favor of terminating his parental rights to J.N.H. A gang expert, Armando Lopez, Jr., provided information on Puro Tango Blast (PTB), a gang that appellant had joined. Lopez explained that prisoners usually join PTB to protect themselves from other "security threat" gangs that exist in prison. PTB members normally tattoo sports teams' logos on their bodies as an identifying marker. To show his affiliation with PTB, appellant had tattooed several stars on his body.[7] Lopez testified that PTB is not a security threat gang like other prison

---

[7]Appellant also has a tattoo on his neck that says, "Trust No Bitch."

13

gangs. In addition, members can enter and exit the gang without committing a major crime. Appellant testified that he left the gang in 2009, but Lopez suggested that leaving the gang while in prison was difficult to believe. The jury had the discretion to find Lopez's testimony more credible than appellant's testimony. *See In re R.W.*, 129 S.W.3d 732, 742 (Tex. App.—Fort Worth 2004, pet. denied). Lopez noted that PTB operates outside of prison and is active in dealing drugs, just as appellant has been. And the jury heard Calloway, the CASA volunteer, characterize a parent's gang membership as threatening to a child's safety. Thus, the jury could have reasonably found that appellant's PTB affiliation raises concerns about his ability to provide J.N.H. with a safe home environment upon his release from prison. *See* Tex. Fam. Code Ann. § 263.307(b)(12)(D), (E).

Our evaluation of J.N.H.'s best interest also cannot disregard appellant's failure to do more to protect J.N.H. from the dangerous environment associated with E.H.'s drug use. Appellant testified that E.H. used drugs while she was pregnant and after J.N.H. was born. He claimed that he had asked E.H. to stop using drugs and had asked friends known to provide her with drugs to cease doing so. However, when those requests proved unsuccessful, he pursued no other protective action on behalf of J.N.H. The jury could have reasonably weighed this evidence in favor of terminating appellant's parental rights. *See J.M.*, 2009 WL 112679, at *7 (holding trial court could reasonably believe

14

father knew child's mother used drugs while pregnant, thus neglecting to provide a safe environment for the child).

Appellant admitted that he used heroin and crack cocaine in 2007 and 2008 while living with his mother despite the fact that his fourteen-year-old sister also lived in the house. Moreover, appellant had friends come to his mother's house to use drugs with him. Appellant recommended placing J.N.H. in his mother's care while he served his prison sentence. The CASA and Department representatives discouraged placing J.N.H. with appellant's mother because her parenting approach included allowing appellant to live with her and her fourteen-year-old daughter while knowing that he was using drugs, and she did nothing to address the endangerment that J.N.H.'s mother was inflicting on the child by using drugs while pregnant with her.

J.N.H. was too young at the time of the trial to express her desire about the termination of appellant's parental rights, but J.N.H. had been happy and comfortable when she was around E.H.'s cousin. J.N.H.'s attorney ad litem recommended termination. J.N.H. typically feels afraid of people whom she does not know. Appellant has never met J.N.H., and appellant's mother has only seen her once or twice.

J.N.H. is not afraid, however, of anyone in E.H.'s cousin's family. In fact, J.N.H. runs and hugs E.H.'s cousin, and J.N.H.'s time with the family involves affection, laughing, and playing. In addition, E.H.'s cousin had already planned to test J.N.H. for any possible impairments and to visit a "play therapist" who

15

specializes in helping children who "move from house to house." E.H.'s cousin agreed to send pictures of J.N.H. to the parents as long as her address remained unknown to the parents, and once J.N.H. turned eighteen, E.H.'s cousin would allow the parents to directly contact J.N.H. if J.N.H. wanted to hear from them. E.H.'s cousin committed to providing for all of J.N.H.'s present and future needs.

Calloway testified that the termination of appellant's rights is in J.N.H.'s best interest because J.N.H. "deserves a permanent family, and she does not deserve to be left out in limbo while [her parents] may or may not get their [lives] together. . . . She deserves the permanency." Calloway also said that it is "very important to a child to have [a] safe feeling of belonging" and that this goal could only be accomplished if J.N.H. is allowed to be adopted. For the same reasons, Calloway opined that it was not in J.N.H.'s best interest for the court to allow supervised visitation between J.N.H. and appellant. The jury could have reasonably found that the testimony from E.H.'s cousin and Calloway concerning their plans for J.N.H. supported termination of appellant's rights. *See Z.C.*, 280 S.W.3d at 477 (giving weight to ad litem's support of termination); *see also U.P.*, 105 S.W.3d at 231–32 (holding, in part, that evidence supported the trial court's best interest finding because the child had bonded with the foster family seeking permanent adoption).

There are also some facts that the jury could have weighed in favor of retaining appellant's parental rights. For example, E.H. testified that there was nothing in her personal experience with appellant that would indicate that he

16

would pose a risk to J.N.H. Appellant said that he had played with his wife's children, had never been violent with them, and had not used or dealt drugs around them. Appellant's mother testified that appellant is a "good kid" who has never argued with her. She testified that appellant played with his nieces and nephews and was "real good" with his wife's children. Appellant's sister testified that appellant interacted well with her children and that she had no concerns about him being around the children. She said that appellant is usually a good person, but she recognized that appellant has made bad choices.

Considering all of the evidence admitted at trial, however, including appellant's extensive criminal and drug histories, his gang affiliation, his lack of any emotional connection with J.N.H., his inability to physically parent her for the next several years, and the Department's plan to provide a positive, permanent environment for J.N.H. through adoption by E.H.'s cousin, we conclude that the jury could have reasonably formed a firm conviction or belief that termination of the parent-child relationship is in J.N.H's best interest. *See* Tex. Fam. Code Ann. § 161.001(2); *C.H.*, 89 S.W.3d at 28; *Z.C.*, 280 S.W.3d at 475–76. We therefore hold that the evidence is factually sufficient to support the jury's termination decision, and we overrule appellant's fourth issue.

17

## Conclusion

Having overruled all of appellant's issues, we affirm the trial court's judgment.

PER CURIAM

PANEL:  LIVINGSTON, C.J., DAUPHINOT and WALKER, JJ.

DELIVERED:  November 17, 2011